UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| CLAUDE CARON,<br><br>　　Plaintiff,<br><br>　　v.<br><br>LOWE'S HOME CENTERS, LLC,<br><br>　　Defendant. | Civil Action No. |

COMPLAINT
JURY TRIAL REQUESTED
INJUNCTIVE RELIEF REQUESTED

NOW COMES the Plaintiff, Claude Caron ("Caron"), by and through undersigned counsel, and complains against the Defendant, Lowe's Home Centers, LLC ("Lowe's"), as follows:

INTRODUCTION

1. This action arises under the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551 *et seq.*, the Maine Whistleblowers' Protection Act ("WPA"), 26 M.R.S. §§ 831, *et seq.*, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*.

PARTIES

2. Caron is a United States citizen residing in Gardiner, Maine.

3. Lowe's is a North Carolina limited liability corporation.

JURISDICTION

4. Lowe's had 15 or more employees for each working day in each of 20 or more calendar weeks in the same calendar year as when the alleged discrimination occurred.

5. The amount in controversy exceeds $75,000.

6. This Court has subject matter jurisdiction over Caron's federal and state claims pursuant to 28 U.S.C. §§ 1331, 1332 and 1367.

1

7. On about May 12, 2017, Caron filed a timely Complaint/Charge of Discrimination against Defendant with the Maine Human Rights Commission ("MHRC") and Equal Employment Opportunity Commission ("EEOC") alleging disability discrimination, retaliation, and whistleblower retaliation.

8. On about August 9, 2017, Caron filed an amended Complaint/Charge of Discrimination against Defendant with the MHRC and EEOC.

9. On about December 11, 2017, the MHRC issued a Notice of Right to Sue with respect to Caron's state law claims.

10. On or about December 11, 2017, the EEOC issued a Notice of Right to Sue with respect to Caron's federal law claims.

11. Caron has exhausted his administrative remedies with respect to all claims requiring administrative exhaustion set forth in her Complaint.

## FACTUAL ALLEGATIONS

12. Caron has had multiple sclerosis ("MS") since 2000.

13. MS has affected Caron's vision on and off since his first flare up of Optic Neuritis in about 2002. Caron now has Optic Neuritis in one eye and Glaucoma in the other which causes blurry vision and pain. Caron has good peripheral vision but there is an absence of central vision. Certain lighting and glare bother his eyes. He cannot see further than 50 feet.

14. During his employment with Lowe's, Caron was subjected to disability harassment and complained about it to management. He also requested and needed reasonable accommodations; some were provided, others were not. On January 17, 2017, Caron was notified that he was being laid off effective immediately in a reduction in force. Lowe's acted unlawfully by selecting Caron to be laid off because of his disability, his complaint about disability harassment, and his request and need for reasonable accommodations.

15. Caron worked at Lowe's Store #2265 from September 2007 until he was fired on January 17, 2017.

16. Caron started out working as a Sales Specialist. He was promoted to Department Manager in 2011. In 2012, he was promoted again to Assistant Store Manager (ASM). As of January 17, 2017, Mr. Caron was one of four ASMs reporting to Store Manager Rodney Wohlford. His base pay was $51,833.60 and he earned annual bonuses of 20% to 30% of base pay. His wages, tips and other compensation reported on his 2016 W-2 were $61,574.76.

17. In spite of his disability, Caron was able to perform the essential functions of his ASM job and he performed them well at all times.

18. When Caron was hired by Lowe's in 2007, his symptoms were not severe and he did not need accommodations.

19. Caron's visual impairment started to affect him at work in 2014 or 2015. He started having difficulty reading paperwork and seeing things at a distance. Caron informed Wohlford and HR Manager Michelle ("Shelly") Brackett about the problem at that time.

20. Lowe's admits that Caron periodically discussed with Wohlford and Brackett that he had difficulty with his vision.

21. Caron began using adaptive equipment like magnifying glasses for working on the computer. He had to ask customers for help reading a POS (point of sale) device while working on the floor. He knew that wasn't optimum but it worked and customers were understanding.

22. Caron was concerned about maintaining his job so in mid-December 2015, he started receiving assistance with workplace accommodations from the Maine Division for the Blind and Visually Impaired ("DBVI").

23. In January 2016, Kathleen Bagley, a DBVI rehabilitation therapist, came to Lowe's to evaluate the lighting and glare that bothered Caron's eyes at work and to recommend solutions. DBVI provided Caron with low vision aids to assist him.

24. Also in January 2016, Caron started working with Mike Adams from Mainely Access, Inc. for ideas about accessing technology. Adams recommended an adaptive keyboard, a magnifier/screen reader, and an iPad.

25. In March 2016, Adams helped Caron test magnifier/screen reader software on a laptop and he was able to read emails, documents and webpages. Caron also tested magnification and screen reading software on an iPad which was also effective in allowing him to read. On March 30, 2016, Adams came to Lowe's and Caron demonstrated how he was presently using technology at work (such as a borrowed video magnifier) and the difficulties he was having. Adams made recommendations about adaptive equipment that would benefit Mr. Caron at work including a laptop with a hard drive and Windows operating system, a ZoomText mag/reader ($599 plus tax and shipping), an iPad Air 2 ($399 + tax), KNFB Reader app ($99 + tax), AfterShock Bluez2 Bone conduction headphones ($99.95 + tax and shipping), and a SmartView Synergy PI video magnifier ($2,795 + tax and shipping).

26. Mr. Caron eventually received a stationary device to assist him from the State of Maine and portable device from a physician's office at Massachusetts Eye and Ear.

27. Less than two weeks after Adams helped Caron with adaptive equipment and made recommendations to Lowe's about equipment purchases, Wohlford tried to take away Caron's ASM job.

28. On Wednesday, April 13, 2016, Wohlford called Caron into a meeting and asked him to step down into a Pro Service position in lumber. Wohlford told Caron that he would try to get Caron a pay rate at the top end of the range.

29. When Caron did not respond positively, Wohlford insinuated that if Caron did not take the Pro Service job, he would make up excuses to fire Caron. He said something to the effect of, "I would hate to have to write you up three times and then walk you out the door."

30. Caron was leaving on a planned trip to Canada on the 16th. He told Wohlford that he would think about Wohlford's request.

31. The following day, Caron happened to take a call from a man who told Caron that Wohlford had contacted him to talk about offering him an ASM position. There were no vacancies for ASMs. Wohlford was obviously recruiting the man to replace Mr. Caron.

32. When Caron returned to work after his trip to Canada, he told Wohlford that he declined to step down from his ASM job. He also told Wohlford that it was not acceptable that he threatened to set him up and terminate his employment.

33. According to Lowe's, there were many reasons why Wohlford asked Caron to step down from his ASM position.

34. First: Lowe's claims that in the early months of 2016, Caron told Wohlford that he intended to step down at the end of 2016. This claim is false. Caron did not tell Wohlford that he intended to step down, he told Wohlford, in the context of asking for reasonable accommodations, that if he ever felt that he could not do his job he would step down. Caron was always able to perform his job and perform it well so he never told anyone that he wanted or needed to step down.

5

35. Second: Lowe's claims that Caron was having difficulty completing his job duties, such as addressing EMS updates, scheduling employees to cover all shifts, and completing certain training. No disciplinary action was ever taken against Caron for these alleged concerns. The documents that Lowe's relies on in support of this claim are ordinary emails. The same and similar emails would have been sent to the other ASMs.

36. Third: Lowe's claims that Wohlford offered to demote Mr. Caron so that he would not have to complete the SSPT (Sales Specialist Performance Tool). The SSPT is a report that ASMs must complete based on the ASM's observations of sales associates and their interactions with customers. ASMs were required to observe the associates' interactions with customers, provide feedback and coaching, and then input the results into Lowe's computer system

37. To the extent that this is true, it is evidence of disability discrimination. As explained further below, Caron needed reasonable accommodations to complete SSPTs in a timely fashion. An employer must provide reasonable accommodations that will allow an employee to perform the essential functions of the job they possess. If and only if the employee cannot perform the essential functions of his job with or without accommodations can an employer offer to transfer an employee to an open, vacant position for which he is qualified.

38. Fourth: Lowe's claims that the Pro Services Sales Specialist position, on day shift, was "particularly suitable for Caron" given that he had previously mentioned to Wohlford that his eyesight was deteriorating to the point where it was difficult to drive at night. This is evidence of disability discrimination for the same reason outlined in the previous paragraph. In any case, Caron disputes the truth of this claim in part because Wohlford never said anything to him about offering him the position so that he would not have to do any night driving. All

6

Wohlford said was that there was an opening in Pro Service and he needed to fill it. Caron does not believe that Wohlford offered the job to him to help him out. The position required a lot of computer and paperwork, even more so than the ASM position did, and Caron was seeking accommodations to enable him to keep up with this type of work.

39. During this time frame, Wohlford, ASM Henderson and others started harassing Caron about his disability. For example:

- Wohlford made comments about sending Caron emails in the smallest possible font to mess with his eyes.
- Wohlford would ask Caron to look at something across the store and then comment, "No sense my pointing, you can't see."
- Wohlford sat around laughing about Caron with Henderson.
- On April 20, 2016, Henderson called Caron "Mr. Magoo" in front of another associate.

40. Wohlford and Henderson were the worst offenders but they set a tone that encouraged other employees to pick on Caron. For example, Steve Cushman said something like, "If Claude can see it, all of us should be able to see it because he is as blind as a bat." Dustin Cardon said something like, "Claude can't see [something] unless it hits him." Brackett in Human Resources heard these comments and laughed instead of making them stop.

41. On April 22, 2016, Caron had had enough of the harassment and made a complaint to Regional Human Resource Manager Rob Howland.

42. Howland asked Caron to write down what happened, and he did. Caron was contacted by Markia Pressley, an investigator in Lowe's Employee Relations department.

43. Pressley told Caron that Lowe's was going to address the problem but that they could not let him know what corrective action was taken, if any.

44. Lowe's claims that Pressley interviewed seven witnesses.

45. Lowe's claims that Henderson was disciplined and counseled for referring to Caron as "Mr. Magoo" but Henderson was actually counseled because he "displayed poor

7

judgment in leadership on multiple occasions" "confirmed via a thorough investigation" which does not directly address the issue of disability harassment.

46. Lowe's did not counsel or discipline Wohlford for his discriminatory treatment of Caron even though witnesses heard Wohlford making fun of Caron's vision and bragging about harassing Caron, for example, by saying that he would highlight emails to Caron so he would not be able to read them.

47. Wohlford and Henderson both continued to work at Lowe's after Caron complained.

48. Wohlford would catch himself as he was about to make a snide comment about Caron's eyesight, something he had not done in the past.

49. Wohlford retaliated against Caron for complaining about disability harassment. Wohlford criticized how the store looked. He had numerous one-on-one meetings with Caron, telling him that he needed to "step up."

50. Wohlford criticized Mr. Caron unfairly for falling behind on his SSPT. As mentioned above, these are reports that ASMs must complete based on the ASM's observations of sales associates and their interactions with customers. ASMs were required to observe the associates' interactions with customers, provide feedback and coaching, and then input the results into Lowe's computer system

51. Mr. Caron had difficulty imputing information on his SSPT because of his visual impairment and Lowe's system was not set up to work with his adaptive equipment. Without proper equipment, the typing process was extremely slow for Caron.

52. Lowe's claims that Wohlford offered to have co-workers help Mr. Caron input information into a computer and assist him in completing his SSPT assignments, which is not true.

53. A co-worker, Alex Muniz, was helping Caron with the typing but all of the observations, feedback and coaching was done by Caron.

54. Wohlford did not want Caron to receive any help so he stopped Muniz from helping Caron.

55. Once Caron had an iPad, he was able to use it to dictate text which was a big help. Unfortunately that was towards the end of his employment. If Caron had an iPad earlier, he would have been able to complete the SSPTs more quickly and on his own.

56. Lowe's held Caron's disability against him by failing to provide adaptive equipment that would enable Caron to input information and complete SSPTs, and then taking disciplinary action against him when he fell behind in this task.

57. On October 1, 2016, Wohlford issued a warning to Caron that read, in part: "Claude has not documented observations in SSPT for the last 3 months ... [and] has been spoken to regarding this behavior in the past by his Store Manager on numerous occasions."

58. Lowe's had been on notice since at least January 2016 that Mr. Caron needed adaptive equipment to perform his job duties effectively when this warning was issued. [1]

59. The October 1, 2016 warning was the only disciplinary action that Caron ever received in his 10 year career at Lowe's. It was issued roughly four months after Caron made an internal discrimination complaint and roughly three months before Caron was fired.

---

[1] At the end of 2016 Lowe's announced that SSPTs were being eliminated as a job requirement due to how much time it took away from performing other tasks.

9

60. Lowe's delay in installing Caron's adaptive equipment put him behind, especially in checking and replying to work emails. His adaptive computer equipment, a computer with special "ZoomText" software, arrived in October 2016 but it just sat in the office for more than three weeks.

61. When it was finally set up, Lowe's technician could not get the ZoomText loaded and Lowe's refused to allow Adams to install it for "security reasons."

62. When Caron was terminated, his adaptive equipment was still not up and running properly.

63. Lowe's also alleges that Caron was "constantly behind" on his Execution Management System ("EMS") updates[2] and on the periodic training that was required of all ASMs. Caron denies these claims. Lowe's admits that Caron was never written up for this.

64. With regard to the EMS updates, Caron always completed them on a daily basis. He would often be the one to open the store and he would do the EMS updates early in the morning. Wohlford would arrive later in the morning and print out the same reports and give them to Caron even though the tasks were already completed or in process but not finalized in the computer yet.

65. With regard to ASM training, it is a smokescreen to single out Caron as "constantly behind" in training. Training was an issue for all of the associates, ASMs and even for Wohlford. It was not a secret: there was a list on the computer of every employee and his or her training scores. At least ninety percent (90%) of the store was behind and everyone received emails reminding them to get caught up on training but finding time was a challenge for Caron and for everyone else.

---

[2] An EMS is a task that is printed and delegated to the appropriate department.

66. According to Lowe's, Wohlford and Brackett learned about Lowe's plan to down-size the number of ASMs on January 9, 2017.

67. Lowe's states that on that very day, Wohlford and Brackett were required to complete a standardized, competency-based assessment of each ASM at the Augusta store based on their demonstrated ability to be impact leaders and strong mentors and coaches, with a global reach in overseeing the store. More specifically, each of the ASMs were rated on the following competencies: coaching others; communicating effectively; focusing on the bottom line; getting organized; getting work done through others; inspiring others; relating skills; and understanding the business. Each employee's tenure was supposed to be factored into the calculation.

68. Lowe's also issued a Notice of Separation to Caron dated January 18, 2017 which contained a document entitled, "Decisional Unit Information." That document read, in part: The factors used in the reduction in force were each individual's supervisory capabilities; ability to achieve company financial objectives; and communication and organization skills."

69. According to Lowe's, Wohlford and Brackett were further instructed to agree on a consensus score between them for each ASM and to input those scores into an evaluation system. The scores from the evaluation were then weighted according to a formula developed at the corporate office and each ASM received a resulting score. Those scores determined who kept his job and who was eliminated.

70. This method is highly susceptible to explicit or implicit bias. If Lowe's was seeking an objective result, managers would score employees separately so that biases could be detected and eliminated and employees would be evaluated on objective and quantifiable metrics.

71. According to Lowe's, the evaluation process ranked the ASMs in the following order: (1) Steven Cushman; (2) Jonathan Henderson; (3) Carlton Hawkins; and (4) Claude Caron. Because Caron was ranked fourth, he was the one that was fired.

72. It is remarkable that Henderson placed second given that the rankings were allegedly based on the ASMs' leadership abilities. Henderson was disciplined in June 2016 for, among other things, referring to Caron as "Mr. Magoo," and for "display[ing] poor judgment in leadership on multiple occasions" "confirmed via a thorough investigation."

73. According to Lowe's, Caron scored low in several categories relative to his peers. However, Defendant did not submit the Performance Evaluation Guides for all four ASMs to the MHRC.

74. According to Lowe's, Caron's biggest demonstrated weaknesses were that he did not exhibit proactive leadership, was a poor communicator when it came to accomplishing multiple tasks, failed to keep his departments informed and failed to plan ahead for larger projects, struggled to complete multiple tasks at once, and was disorganized, often causing his performance to suffer further.

75. These claims regarding Caron's performance are false.

76. The evidence regarding Caron's performance, including witnesses who worked with and for him, contradicts the claim about Caron's performance.

77. In addition, in his 10 years with Lowe's, Caron received at least 10 Customer Focused Accolades.

78. On January 17, 2017, the four ASMs were called into the training room one at a time. They knew in advance that one of them was going to be laid off in a reduction in force.

Caron's appointment was at 11:00 AM. Wohlford and Brackett were present. The meeting lasted less than 10 minutes.

79. Wohlford told Caron that he was the ASM who was chosen for the layoff. Caron was shocked.

80. Caron asked who made the decision. Wohlford told Caron that he and Brackett made the decision together.

81. Of the four ASMs, Caron had worked for Lowe's the longest.

82. Of the four ASMs, Caron worked as an ASM the longest.

83. Caron was an ASM for about four years. Henderson had been an ASM for about sixteen months. Hawkins had been an ASM for about five months. Cushman had been an ASM for about five weeks.

84. Lowe's claims that an employee who had worked as an ASM for only five weeks was better than an ASM with four years of experience coaching others, focusing on the bottom line, getting work done through others, inspiring others, understanding the business and other factors that were allegedly measured.

85. Lowe's claim is implausible.

86. *Membership in protected class/disability:* Caron has disabilities as defined by the MHRA and the ADA.

87. Caron has multiple sclerosis and abnormal vision loss both of which are *per se* disabilities under the MHRA. 5 M.R.S. §4553-A(B).

88. Caron's multiple sclerosis and abnormal vision loss substantially limits the major life activities of seeing and working when viewed without mitigating measures.

89. Caron has a record of disability under the MHRA and ADA.

90. Caron was regarded as disabled as evidenced by the negative comments made by Wohlford and others about Caron's difficulty seeing and the disciplines and reprimand given to Caron in connection with his limitations with completing computer work without his requested accommodations.

91. Caron was a qualified individual with a disability as defined by the MHRA and ADA.

92. Caron was able to perform the essential functions of his job with or without reasonable accommodation.

93. *Protected activity:* On April 22, 2016, Caron engaged in protected activity by reporting and complaining about disability harassment.

94. Caron reported Henderson and a number of employees harassed him because of his disabilities.

95. Caron reported that the Store Manager Wohlford was one of the worse harassers. Wohlford made negative comments about Caron's eyesight and that he joked about making work harder for Caron by sending him documents that he could not read.

96. Caron's report of disability harassment was a factor in the scoring of the ASMs for layoff and the subsequent layoff.

97. Lowe's violated the MHRA, ADA and WPA by retaliating against Caron for reporting disability harassment.

98. *Reasonable accommodation requests:* Caron requested and needed reasonable accommodations for his multiple sclerosis and abnormal vision.

99. Caron asked for and needed adaptive equipment like magnifying glasses for working on the computer.

100. Caron asked for and needed help reading a POS device while he was on the floor.

101. Caron asked for workplace accommodations from the Maine DBVI and Mainely Access.

102. Caron asked for and needed help from a co-worker, Alex Muniz, typing information into SSPTs.

103. Caron asked for and needed adaptive computer equipment and a computer with special "ZoomText" software.

104. Lowe's failed to provide the accommodations requested and needed by Caron.

105. When Caron's coworker Muniz helped Caron with typing information into SSPT, Lowe's ordered Muniz to cease providing this accommodation.

106. Lowe's delayed setting up the equipment provided at no cost by a third party and Caron was fired before it was up and running properly.

107. Lowe's violated the MHRA and ADA by failing to provide Caron with reasonable accommodations, denying and delaying accommodations that Caron and others arranged without Lowe's assistance, terminating Caron for reasons that could have been ameliorated by a reasonable accommodation, and terminating Caron in retaliation for requesting and needing reasonable accommodations.

108. *Satisfactory job performance:* Caron's job performance as an ASM was always at least satisfactory and often exemplary.

109. *Adverse employment action:* On January 17, 2017, Caron was involuntarily laid off.

110. *Defendant had a continuing need for ASMs when Caron was laid off:* Steven Cushman, Jonathan Henderson and Carlton Hawkins remained employed as ASMs at Lowe's Store #2265 when Caron was laid off.

111. *Proof of pretext, discrimination, and retaliation:*

    A. Tenure was supposed to be a factor in deciding which ASM would be laid off. Caron has the most tenure of the four ASMs by far, yet Caron was selected for lay off.

    B. Leadership was supposed to be a factor in deciding which ASM would be laid off. Henderson was written up for "display[ing] poor judgment in leadership on multiple occasions" "confirmed via a thorough investigation" yet he was retained and Caron was laid off.

    C. The fact that Caron never received any valid disciplinary actions or performance improvement plans is proof that the negative assessment of his skills and abilities as an ASM was invalid.

    D. Wohlford's animus toward Caron's disabilities is proof that Caron was laid off due to his disabilities.

    E. The fact that Lowe's lacks documentation to back up its claims regarding Caron's alleged poor performance as an ASM is evidence that the decision to lay him off was made based on subjective, discriminatory factors and not legitimate, objective business reasons.

    F. Lowe's explanation for terminating Caron while retaining other employees is implausible and is contradicted by the facts.

    G. The timing of Caron's protected activity and his termination evidence a causal connection.

112. Lowe's knowingly and willfully violated Caron's rights under the ADA, MHRA, and WPA.

113. Lowe's unlawfully discriminated and retaliated against Caron with malice or reckless indifference to his rights.

114. As a result of Lowe's unlawful discrimination against Caron, he has suffered lost wages, lost benefits, loss of enjoyment of life, loss of self-esteem, injury to reputation, injury to career, humiliation, and other pecuniary and non-pecuniary losses.

115. Caron has no plain, adequate, or complete remedy at law to fully redress the wrongs alleged, and he will continue to suffer irreparable injury from his treatment by Lowe's unless and until Lowe's is enjoined by this court.

## COUNT I: MHRA
## UNLAWFUL DISCRIMINATION

116. Paragraphs 1-115 are incorporated by reference.

117. Lowe's conduct constitutes unlawful disability discrimination against Caron in violation of the MHRA.

## COUNT II: MHRA
## UNLAWFUL RETALIATION

118. Paragraphs 1-117 are incorporated by reference.

119. Lowe's violated the MHRA by retaliating against Caron because he requested and needed reasonable accommodations for his disabilities and because Caron complained about disability harassment.

## COUNT II: MHRA
## FAILURE TO ACCOMMODATE

120. Paragraphs 1-119 are incorporated by reference.

121. Lowe's violated the MHRA by failing to provide Caron with reasonable accommodation.

### COUNT III: ADA
### UNLAWFUL DISCRIMINATION

122. Paragraphs 1-121 are incorporated by reference.

123. Lowe's conduct constitutes unlawful discrimination against Caron in violation of the ADA.

### COUNT IV: ADA
### UNLAWFUL RETALIATION

124. Paragraphs 1-123 are incorporated by reference.

125. Lowe's violated the ADA by retaliating against Caron because he requested and needed reasonable accommodations for his disabilities and because Caron complained about disability harassment.

### COUNT II: ADA
### FAILURE TO ACCOMMODATE

126. Paragraphs 1-125 are incorporated by reference.

127. Lowe's violated the ADA by failing to provide Caron with reasonable accommodation.

### COUNT V: WHISTLEBLOWERS' PROTECTION ACT

128. Paragraphs 1-127 are incorporated by reference.

129. Lowe's violated the WPA by retaliating against Caron for reporting what he in good faith believed was unlawful disability harassment.

### PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

A.  Enter Judgment in Caron's favor;

B.  Declare the conduct engaged in by Defendant to be in violation of his rights;

  C. Enjoin Defendant, its agents, successors, employees, and those acting in concert with it from continuing to violate his rights;

  D. Order Defendant to employ Caron in his former position or, in the alternative, award Caron front pay and benefits;

  E. Award equitable-relief for back pay, benefits and prejudgment interest;

  F. Award compensatory damages in an amount to be determined at trial;

  G. Award punitive damages in an amount to be determined at trial;

  H. Award nominal damages;

  I. Award attorney's fees, including legal expenses, and costs;

  J. Award prejudgment interest;

  K. Permanently enjoin Defendant from engaging in any employment practices which discriminate on the basis of disability;

  L. Require Defendant to mail a letter to all employees notifying them of the verdict and stating that Defendant will not tolerate discrimination in the future;

  M. Require that Defendant post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

  N. Require that Defendant train all management level employees on the protections afforded by the MHRA, ADA, and WPA;

  O. Require that Defendant place a document in Caron's personnel file which explains that Defendant unlawfully terminated him because of disability discrimination and retaliation; and

  P. Grant to Caron such other and further relief as may be just and proper.

| | |
|---|---|
| Dated:  January 30, 2018 | /s/ Chad T. Hansen |
| | chansen@maineemployeerights.com |

Attorney for the Plaintiff

MAINE EMPLOYEE RIGHTS GROUP
92 Exchange Street 2nd floor
Portland, Maine 04101
Tel. (207) 874-0905
Fax (207) 874-0343